RECORD NO. 17-1698

IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

**JOHN CURTIS,**

*Plaintiff-Appellant,*

**v.**

**CAFE ENTERPRISES, INC.,**
**d/b/a Fatz Cafe, f/k/a Fatz Cafe, Inc.,**

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF NORTH CAROLINA AT STATESVILLE

_____

OPENING BRIEF OF PLAINTIFF-APPELLANT

_____

William Everett Moore, Jr.
GRAY, LAYTON, KERSH,
 SOLOMON, FURR & SMITH, PA
516 South New Hope Road
P. O. Box 2636
Gastonia, North Carolina 28053-2636
(704) 865-4400 (Telephone)
bmoore@gastonlegal.com

Counsel for Plaintiff-Appellant

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __17-1698__    Caption: _John Curtis v. Cafe Enterprises, Inc._____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_John Curtis, Plaintiff_____
(name of party/amicus)

_____

who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO

2.     Does party/amicus have any parent corporations?                          ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
       other publicly held entity?                                              ☐YES ☑NO
       If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(a)(2)(B))? ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)   ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?   ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature:  ___s/William E. Moore, Jr._____       Date:  ____06/16/2017____

Counsel for: __Appellant John Curtis_____

## CERTIFICATE OF SERVICE
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

I certify that on _____06/16/2017_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

J. Michael Honeycutt
Adam M. Bridgers
Fisher & Phillips, LLP
227 West Trade Street, Suite 2020
Charlotte, NC 28202
Tel: 704-334-4565
Fax: 704-334-9774
mhoneycutt@laborlawyers.com
abridgers@laborlawyers.com

___s/William E. Moore, Jr._____                _____06/16/2017_____
      (signature)                                              (date)

TABLE OF CONTENTS

CORPORATE DISCLOSURE

TABLE OF CONTENTS ................................................................................i

TABLE OF AUTHORITIES ........................................................................v

I.    JURISDICTIONAL STATEMENT .............................................1

II.   STATEMENT OF THE ISSUES ................................................1

     A.    DID THE DISTRICT COURT ERR IN GRANTING THE MOTION FOR SUMMARY JUDGMENT AND ENTERING JUDGMENT IN FAVOR OF DEFENDANT CORPORATION, ON ALL COUNTS OF THE COMPLAINT? .....

     B.    DID THE DISTRICT COURT ABUSE ITS DISCRETION IN DENYING THE MOTION OF PLAINTIFF CURTIS TO AMEND OR CORRECT THE ORDER GRANTING SUMMARY JUDGMENT AND FOR RELIEF FROM JUDGMENT UNDER F.R.CIV.P., RULES 59 AND 60? .............1

III.  STATEMENT OF FACTS .........................................................2

IV.   SUMMARY OF ARGUMENT ...................................................6

V.    ARGUMENT ..............................................................................7

     A.    Standard of Review – FROM PLAINTIFF'S ORIGINAL/AMENDED BRIEF OPPOSING SUMMARY JUDGMENT ..............7

     B.    THE DISTRICT COURT ERRED BY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON ALL COUNTS OF PLAINTIFF'S COMPLAINT AND ENTERING JUDGMENT IN FAVOR OF DEFENDANT ....8

         1.    PLAINTIFF'S EVIDENCE RAISES GENUINE ISSUES OF MATERIAL FACT .........................................................................9

     C.    THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING PLAINTIFF'S MOTION TO ALTER, AMEND OR CORRECT THE

iii

SUMMARY JUDGMENT ORDER AND IN DENYING RELIEF FROM
JUDGMENT .................................................................................................24

CONCLUSION ..............................................................................................29

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Clipper Exxpress v Rocky Mt. Motor Tariff Bureau,* 674 F2d 1252
(1982, CA9 Cal)..................................................................................25

*Collison v. International Chemical Workers Union*, 34 F.3d 233, 236
(4th Cir. 1994)..................................................................................24

*EEOC v. Womble Carlyle Sandridge & Rice*, LLP, 616 F. App'x 588, 593
(4th Cir. 2015)....................................................................................7

*Fortress Re, Inc. v. Cent. Nat'l Ins. Co. of Omaha*, 766 F.2d 163, 166
(4th Cir. 1985) ...............................................................................7, 26

*Galloway v. Santander Consumer USA, Inc.*, 819 F.3d 79, 87 (4th Cir. 2016) ......16

*Hartsell v. Duplex Prods.*, 123 F.3d 766, 771 (4th Cir. 1997) ..................................7

*Hutchinson v. Staton*, 994 F.2d 1076, 1081 (4th Cir. 1993)....................................24

*Nat'l Mfr. &Stores Corp. v. Whitman,* 93 F.2d 829, 831-832 (4th Cir.1938).........16

*St. Paul Reinsurance Co. v. Rudd*, 67 F. App'x 190, 194-95 (4th Cir. 2003)............7

*Watson v. Southern R. Co.*, (D.S.C. 1975), 420 F Supp 483, aff'd,  (4th Cir. S.C.
1976), 542 F2d 1170 ............................................................................ 7-8

## STATE CASES

*Honeycutt v. Honeycutt*, 208 N.C. App. 70, 80-81, 701 S.E.2d 689, 695-696
(N.C. Ct. App. 2010).............................................................................16

*Newton v. Standard Fire Ins. Co.*, 291 N.C. 105, 111, 229 S.E.2d 297,
301 (1976) .......................................................................................19

*Peed v. Peed*, 72 N.C. App. 549, 553, 325 S.E.2d 275, 279 (1985)........................22

*Supplee v. Miller-Motte Bus. Coll., Inc.*, 768 S.E. 2d 582 (N.C. App., 2015) ..........9

*Unifour Construction Services v. Bellsouth*, 594 S.E.2d 802, 163 NC App. 657 (N.C. App., 2004) ................................................................................................................20

## FEDERAL STATUTES

28 USC §1332 .................................................................................................................1

28 USC §1291 .................................................................................................................1

## FEDERAL RULES

F.R.C.P. 56 .....................................................................................................................7

F.R.C.P. 59 (e) ........................................................................................................1,24,25

F.R.C.P. 60 (b) ........................................................................................................1, 5-26

FR APP. 3,4 ....................................................................................................................1

## STATE STATUTES

N.C. GEN. STAT. § 59-37 ............................................................................................22

N.C. GEN. STAT. § 59-52 ............................................................................................22

N.C. GEN. STAT. § 1D-1 .............................................................................................20

S.C. CODE ANN §333-41-220 ....................................................................................22

## OTHER

RESTATEMENT (SECOND) OF CONTRACTS §53(3)......................................16

# I.     JURISDICTION AND VENUE

Plaintiff-Appellant, John Curtis ("Plaintiff"/"Curtis"), a North Carolina citizen, sued Defendant-Appellee, Café Enterprises, Inc. ("Defendant"/"Corporation"), a South Carolina corporation, who removed the case from Lincoln County Superior Court, to U.S. District Court (W.D.N.C.)(JA 14, 19). Because complete diversity exists between the parties, and the amount in controversy exceeds $75,000, the federal court has jurisdiction pursuant to 28 U.S.C. § 1332 and is a situs of proper venue. The United States Court of Appeals (C.A. 4) has jurisdiction on appeal pursuant to 28 USCS § 1291 and F. R. App. P., Rules 3 and 4, by Plaintiff's timely Notice of Appeal from district court orders granting summary judgment for the Defendant Corporation on all claims and denying Plaintiff's post-judgment motions under F.R.Civ.P. Rules 59(e) and 60(b).

# II. STATEMENT OF ISSUES

A. DID THE DISTRICT COURT ERR IN GRANTING THE MOTION FOR SUMMARY JUDGMENT AND ENTERING JUDGMENT IN FAVOR OF DEFENDANT CORPORATION, ON ALL COUNTS OF THE COMPLAINT?

B. DID THE DISTRICT COURT ABUSE ITS DISCRETION IN DENYING THE MOTION OF PLAINTIFF CURTIS TO AMEND OR CORRECT THE ORDER GRANTING SUMMARY JUDGMENT AND FOR RELIEF FROM JUDGMENT UNDER F.R.CIV.P., RULES 59 AND 60?

### III.    STATEMENT OF FACTS

On June 27, 2011, Café Enterprises, Inc, ("Corporation") and Curtis signed a written "Operating Partner and Employment Agreement" (the "Agreement"). (J.A. at 19-20, 39, 1728-1738)  Curtis paid the Corporation twenty-five thousand dollars ($25,000.00) in exchange for promises of: continued employment and a five-year term of employment as Operating Partner/General Manager of the Lincolnton, N.C. Restaurant"; an annual base salary; a monthly "Incentive Amount" of 'Profits After Controllables' ("PAC"); and, a final "Incentive Amount" equal to 10% of the PAC averaged over the last two years of the contract. (JA1728-1738, 39-41) Corporation's "Position Description" gives an Operating Partner responsibility for *e.g.,* the operation and profitability of the restaurant, scheduling Personnel the management team, all operational costs, including labor. (JA 1179)  The term of the Agreement commenced on June 27, 2011 and was to continue until June 27, 2016, (the "Termination Date"), "unless earlier terminated in accordance with Section 12.(JA 1729).

"Section 12(a)" provides that, "[t]he …Agreement may be terminated by the mutual written agreement of the Operating Partner and the Corporation." (JA 55, 1733) Amendments "by mutual consent of the parties" shall be "invalid unless in writing, signed by the Corporation and the Operating Partner."  (JA at 1738)The Operating Partner's Employment and this Agreement will terminate immediately

2

upon the existence of Cause defined as the Corporation's "reasonable belief" of "[t]he failure of Operating Partner to perform the duties required" under § 12(c)(i) ("Performance"), or *e.g.*, "[a]ny commission of fraud by Operating Partner (including, without limitation, "padding" the payroll…) under § 12(c)(ii)-(vii) ("Intentional Violations").(JA 1734)  An early termination for "Performance" under §12(c)(i) dictates that "this Agreement will not be terminated pursuant to this subsection… unless the Corporation first gives Operating Partner a written notice of [specific] deficiency ("Notice of Deficiency")."  The Operating Partner "will have a period of thirty (30) calendar days… in which to cure the deficiencies… ."(JA 1733)Upon a disputed termination involving an "Intentional Violation", "the Corporation and the Operating Partner will enter immediately into binding arbitration…, the cost of which will be borne by the non-prevailing party."(J.A. 1734-35)On April 24, 2012, the parties entered an "OPERATING PARTNER AND EMPLOYMENT AGREEMENT AMENDMENT".(JA at 1739).  The Amendment was signed by "Café Enterprises, Inc."

Prior to September 16, 2014, Johnny C. Richard "Richie" Cannon ("Cannon"), Chief Operations Officer, unilaterally decided to terminate Plaintiff's employment and the Operating Partner Agreement. JA 1063-67;1747-48; 1126, 1132-33, 1578-83.Cannon prepared two different versions of a termination notice. On September16,2014, Cannon a n d  t wo "Area Partners", Gary Tate ("Tate") and

"Chip" Hoskins ("Hoskins"), met with Curtis in the home office at 10:00 am. (J.A. at 145, 421-423, 510, 521-522). Cannon "started the meeting by acknowledging to [Curtis] that he was going to be terminated for intentional violation of his contract. …trying to manipulate payroll."  Cannon then offered two different "termination agreements", one which would have taken effect immediately, and a second which allowed [Plaintiff] to finish out the month." He reported that Curtis "opted to agree to support Lincolnton in his Operating Partner capacity until inventory was completed on September 29, 2014, at which time the termination would be effective."  Although Plaintiff refuted the stated reason and manner of termination, Tate reports that Cannon "kept the focus of the meeting to the improper coding of hourly payroll dollars."(JA at 112-115, 213, 264-266).

Plaintiff testified that he "was forced to sign this agreement." He said he "wasn't going to sign this agree mentor the other agreement, and Mr. Cannon said that they were not leaving this room until Plaintiff signed one, and that Curtis had a choice.  He said, he didn't "agree with any of this.  This is bullshit."  He said, "I am being railroaded.  You-all know am.  This is bull."  Plaintiff then said, "I'll agree to disagree, but I'm not agreeing" and Cannon said, "You will agree." That's what Plaintiff was told.  Plaintiff testified that he had signed one of the "agreements" while he was at the home office, but it was "the wrong agreement" and then he had to go back and get the right agreement."   Plaintiff testified, "I signed both

4

agreements." When asked if somebody put a gun to his head, he responded, "Well, when I first found out I had to go there, I asked if I should bring a lawyer and was told by Gary Tate that I didn't need a lawyer. So after further review, I did need a lawyer, and they put me in a spot where, had I known I could have just got up and walked out and not signed either one, and everything… I would have done exactly that. But yes, I was forced to sign this paper." Plaintiff testified that he "felt as though" he was "physically threatened", "yes", by Richie [Cannon]." (JA 316-318).

The first document was signed and witnessed (confirming immediate termination for "intentional violation of his contract"), Plaintiff was allowed to leave. Later he returned to see if he could finish out the month and signed the "second" memo (with no witnesses present other than Cannon). (JA 12-38, 315, 366-368, 543).

Plaintiff finished out the month, was compensated for that work and paid for another two weeks. (JA 222-29) Curtis had one (1) year and nine (9) months remaining under the Agreement (most of the last two (2) years of the Agreement's 5-year term).

Summary judgment was granted without a hearing in favor of Defendant on all of Plaintiff's claims on November 21, 2016(JA 1770-93), and Judgment was entered by the Clerk on the same date (JA 1794). On December 19, 2016 Curtis timely filed a motion to Alter, Amend or Correct the Order and/or for Relief from Judgment under F.R.Civ.P. Rules 59(e) and 60(b), along with a

5

Memorandum of Law in Support of such motion (Docs 33 and 34). (Curtis's motion was amended with leave of court on 01/12/2017 (JA1795-1807); [Doc38]. Defendant responded and Plaintiff replied. [Docs 39, 40]. On 05/12/17, the district court denied Curtis's motion, again without hearing. (JA 1808). Curtis filed timely Notice of Appeal to the United States Court of Appeals for the Fourth Circuit on June 2, 2017 (JA 1812).

## IV. SUMMARY OF ARGUMENT

On September 16, 2014, "Defendant gave Plaintiff notice of his discharge" and thereby breached the Agreement (*Cf.*, JA1770, 1726, 123, 43). *See generally*, JA 1780, 816, 22, 44, 55-222, 222-1756.The early termination was not "in accordance with Section 12" of the Agreement; genuine disputes exist about the validity of the termination of the Agreement, Defendant's "reasonable belief" of "Cause", and the manner by which Defendant effectuated the termination, giving rise to related issues of breach of *e.g.,* fiduciary duties/constructive fraud, breach of contract accompanied by fraudulent acts, and compensatory and punitive damages. The district court's Orders regarding Summary judgment were clearly in error and the Judgment should be reversed.

# V.   ARGUMENT

## A.   Standard of Review.

The Fourth Circuit will "review the grant of summary judgment *de novo*, using the same standards as applied by the district court." *E.g., Hartsell v. Duplex Prods.*, 123 F.3d 766, 771 (4th Cir. 1997).  The Appellate Court "must review the record 'taken as a whole' . . . [and] draw all reasonable inferences in favor of the nonmoving party." *EEOC v. Womble Carlyle Sandridge & Rice, LLP*, 616 F. App'x 588, 593 (4th Cir. 2015) (internal citations omitted.).

> "… On summary judgment, we construe the underlying facts in the light most favorable to the party opposing the motion. We may uphold an award of summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ. P. 56(c).  Additionally, we are guided by the principle that "summary judgment is rarely appropriate in actions in which the litigant's state of mind, motive, or subjective intent is an element of [the] plaintiff's claim." see also *Fortress Re, Inc. v. Cent. Nat'l Ins. Co. of Omaha*, 766 F.2d 163, 166 (4th Cir. 1985) ("[A] subjective standard for determining whether an insured acted in good faith makes it unlikely that the issue can be resolved by summary judgment.").

*St. Paul Reinsurance Co. v. Rudd*, 67 F. App'x 190, 194-95 (4th Cir. 2003) (internal citations omitted.)  "Since its impact is rather drastic, summary judgment … should be cautiously invoked so that no person will be improperly deprived of trial of disputed factual issues." *Watson v. Southern R. Co.*, (D.S.C. 1975), 420 F Supp 483,

*aff'd*,  (4th Cir. S.C. 1976), 542 F2d 1170; USCS Fed Rules Civ Proc R 56 ("9. – Summary judgment is drastic remedy").

B.     THE DISTRICT COURT ERRED BY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON ALL COUNTS OF PLAINTIFF'S COMPLAINT AND ENTERING JUDGMENT IN FAVOR OF DEFENDANT.

Defendant breached the Agreement when Cannon announced the termination, at the beginning of the meeting on September 16, 2016.Plaintiff was thereafter forced to make a "Hobson's choice" of signing one of two termination notices: one for immediate termination and one "working a two-week notice." The district court erred by adopting the second signed document as "proof certain" of a voluntary, mutually consented decision, even adopting the label, "Mutual Termination Agreement" ("MTA"), despite direct and circumstantial evidence to the contrary.

The lower court stated that it was "irrelevant and immaterial whether Defendant decided to terminate the Agreement before … or during the September 16, 2014 meeting," reasoning that the "only relevant fact is that the parties entered into the Mutual Termination Agreement, and that fact is undisputed."  (JA 2006) The validity of the MTA is indeed in dispute.  It was not signed by "Café Enterprises, Inc." but was conceived, drafted, and presented by Cannon (an interested witness whose credibility is at issue). The document is not in proper form, and was vehemently refuted by Plaintiff during the meeting.

The district court inferred "Mutual Consent" as the MTA name implies. Yet, Plaintiff's "consent" was under duress. The termination had already been announced as "for Cause"; it was not a proper "Agreement" - not signed in the name of the Corporation, nor with any stated authority.  Tate and Hoskins never saw the "second" memo signed, but their signatures are now affixed on the document, falsely representing that they witnessed the signatures. *See e.g.*, (JA 1747, 1577, 1017-22) The district court decided that there was no breach of contract, as a matter of law, because Plaintiff signed a document forced upon him and felt an obligation to choose the lesser of two evils, in order to feed his family. Evidence was presented showing the Agreement was summarily terminated in bad faith for false reasons, and not "in accordance with Section 12."  The district court's reasoning is flawed as to the wholesale dismissal of Plaintiff's claims for the following reasons:

## 1. PLAINTIFF'S EVIDENCE RAISES GENUINE ISSUES OF MATERIAL FACT.

The question of whether a breach of contract is material is ordinarily a question for a jury." *E.g., Supplee v. Miller-Motte Bus. Coll., Inc*., 768 S.E. 2d 582 (N.C. App., 2015). The MTA posits that Tate's direction "was to reduce the dollars spent", and that Plaintiff "simply changed the job code to shift leader; leaving the associate with the same job description and pay rate…"(JA 1726, 115, 1068-69, 807-11)."On or about September 1, 2014, Defendant instructed Plaintiff to reduce

9

administrative hours." JA 1775, 20, 43. This "direction" was never reduced to writing or made a formal policy of Café Enterprises, Inc. (prior to Plaintiff's termination), and no specific deadline or timeline was given to reduce or eliminate "Admin" hours. However,

> "…Operating Partners were allowed to use hourly employees for "shift management," or as a "shift leader," or in "key hourly" positions. [Doc. 1-1] at 11–13; [Doc. 5] at 3–4. During such times, Plaintiff used an hourly employee named Katrina Russell to perform managerial duties, and she clocked in under administrative hours." [Doc. 1-1] at 13–14; [Doc. 5] at 4–5; [Doc. 19] at 5.

JA 1774.Katrina Russell ("Katrina") was a former manager with authority to access the computer and close the restaurant as a "key hourly employee", clocking in on the company network under the "administrative" job code ("Admin") in order to help close out a shift or to perform other managerial duties such as voids and discounts. JA 145, 637-638, 203, 1382)

Katrina was paid $12.00 an hour, whether clocked in as "Admin" or as "Host". Thus, any change in her job code was immaterial to the Fatz Restaurant's payroll or actual labor cost, and could not "reduce the dollars spent on hourly associates" for the shifts pre-assigned by the General Manager and already worked by the staff. JA 849,1012, 1388-1389, 1396-1397, 1412-1413, 1415, 83, 987-988, 993, 1000-1002, 163-164, 171. Plaintiff openly requested that Katrina be re-classified on the company's computer payroll as a "Host" (not "shift leader").Plaintiff advised his

10

superiors , and the change in job code was an accepted practice throughout the company.

The accusation of "Cause" was contrived. The MTA is comprised of false statements, incorrect dates (2011"), and is factually and legally deficient as an Amendment to the Agreement or as a "written mutual agreement" under Section 12 of the contract.

There is no evidence that John Curtis was "padding" the payroll or intentionally violating any other rule or regulation. (The MTA even acknowledges that the pay rate for Katrina remained the same).   The specter of immediate termination 'for [an illegal] Cause" coupled with confinement, and physical threat, was sufficient to bully John Curtis into signing the MTA under duress in violation of Section 12, not in accordance therewith.

The "reasonable belief" of an intentional violation of the Agreement creates an immediate termination "for Cause" under Section 12(c)(ii). The Corporation and the Operating Partner must then immediately arbitrate any dispute over such a "for Cause" termination.   Neither of those things happened here and the inference (favorable to Plaintiff) is that there was no "Cause" and the termination was done in bad faith.

The document memorializes, "Meeting with John Curtis Re: Performance" but a termination for cause based on "Performance" requires a specific "Deficiency

11

Notice" and a 30-day grace period in which to cure the specified deficiencies "in accordance with Section 12 of the Agreement.  Compare JA 109 with JA 55Section 12(c).

" "On or about September 16, 2014, Defendant gave Plaintiff notice of his discharge". (JA 1775), citing JA 1726,16, 43. At that point, Plaintiff had signed no written agreement of mutual consent to termination; yet, he was not immediately terminated "for cause" as announced, and had received no "Deficiency Notice" and 30-day cure period in accordance with Section 12 of the Operating Partner Agreement.) In the middle of his last "two-years" of the five-year term contract, both Plaintiff's employment and the Operating Partner Agreement were "earlier terminated" but not "in accordance with Section 12" as required by the contract.

The MTA does not appear to be a contract or an "Amendment", but rather more of a disciplinary notice, in "memo" form; it does not mention "Cafe Enterprises, Inc." (*cf*., JA1739); it lacks valid indicia of a formal novation superseding the Agreement, and is disputed as to its title, form and substance.  This "Performance" memo was created in advance, but never reviewed by the legal department or the Corporation's Human Resources Department on behalf of Café Enterprises, Inc. Yet this one-page, fake notice forms the linchpin of the Order granting summary judgment on all of Plaintiff's state law claims (sounding in

contract, tort or equity), having been credited and adopted by the district court as a valid and binding "Mutual Termination Agreement". (JA 109).

> "Section 12 of the Agreement plainly outlines the parties' respective rights to terminate the Agreement. [Doc 19-1] at 7. … Both Plaintiff and Defendant agree that the Mutual Termination Agreement was executed on September 16, 2014, ([Doc. 23-17]; [Doc. 1-1] at 10; [Doc. 5] at 5), but Plaintiff argues that the Agreement was not mutual." [Doc. 23-2] at 14.

JA 1780.The district court acknowledged Plaintiff's evidence of duress, (see JA 1016-1018), and concluded that "at this stage in the litigation, the Court will not discredit the allegation of duress." JA 1781-1782.  Nonetheless, the disputed issue of duress "failed to preclude summary judgment." *Id.* Having presented genuine evidence of duress, Curtis adequately disputed his forced signature as something other than evidence of mutual consent or an "arms' length" transaction. JA 1016-1018. Plaintiff raised a genuine issue of material fact, and summary judgment was improper.

The "Mutual Termination Agreement" shows no indicia of authority to bind the Defendant Corporation, and thus fails to comply with Section 12(a) of the Agreement. (JA 1726) The flaws in form and substance raise questions about the validity and weight to be given the document on its face. (JA 1728, 1739,1726).

The district court blindly accepted Defendant's version of the termination, as shown by the following passage:

13

"Defendant gave Plaintiff the opportunity to resign immediately (immediate termination "for-cause") or to work two additional weeks. [Doc. 1-1] at 15; [Doc. 5] at 5; [Doc. 23-2] at 7; [Doc. 27] at 3. Plaintiff chose the latter option, and Plaintiff and Defendant entered into a mutually consented termination agreement ("Mutual Termination Agreement") pursuant to Section 12(a), titled "Mutual Consent," of the Agreement." [Doc. 23-17]; [Doc. 1-1] at 10; [Doc. 5] at 5.

JA 1770. Plaintiff had two choices: "slim" and "none". The attraction of the "opportunity to resign" from a guaranteed 5-year salary, plus monthly and final Incentive Amounts is hard to discern; the value of the "option" of having a job for only two weeks, having just lost everything bargained for over three years before and worked for ever since is even more difficult to imagine, especially when the alternative is being falsely accused and immediately fired. Plaintiff's "opportunity" and "options" can only be "valuable consideration" when faced with the threat of an "immediate termination "for-cause". The existence of such "Cause" depends on the reasonableness of Defendant's "belief" under Section 12, which Plaintiff's evidence refutes, creating a jury issue.

Although the MTA's subject is "Performance", there is a genuine dispute over Defendant's "reasonable belief' in Plaintiff's "failed performance. (JA 1734) No "Notice of Deficiency" was ever given by Defendant, and a for-cause termination based on "performance" without the Notice of Deficiency and the 30-day grace period, is not "in accordance with Section 12".

Paragraph 40 of Plaintiff's Complaint states that,… [i]n order to minimize his

14

damages from the impending loss of employment, Plaintiff worked through the end of the month of September. (JA 21-38). The district court reasoned that "duress" (while genuinely disputed) was immaterial, because Plaintiff accepted "the benefits under the Mutual Termination Agreement" (JA 1782). (Of course, if signed under duress, the "Mutual Termination Agreement" was neither "Mutual" nor a valid Amendment to the "Agreement".) Moreover, the purported "benefits" accepted by Plaintiff consisted of a mere fraction of the employment term and incentive amounts previously promised, bought, earned and paid for under the 5-year Agreement signed June 27, 2011. Such "Mutual Consent" is in dispute and not "in accordance with Section 12(a).

> The district court acknowledged there was evidence that
>
> "[Plaintiff] …signed the Mutual Termination Agreement because he has "a family to support, and [he] was looking at the fact that [he] was at least getting four more weeks out of the deal," which indicates he contemplated and chose the offered benefits. [Doc. 23-7] at 252–253; [Doc. 23-2] … Plaintiff ratified the Mutual Termination Agreement by accepting the benefits from the transaction, and is estopped… ."

JA 1781. The inference is drawn in favor of the Defendant Corporation, instead of the non-movant. The court should have inferred that Plaintiff was trying to minimize his damages from a recent breach that was in violation of his long-standing Operating Partner Agreement, but which left him without his job, title, or promised salary and benefits. Finding that Plaintiff is "estopped" by the 9/16/14 ignores the equities suggested by the evidence. There is no real benefit, "advantage," nor even

15

valid consideration for the termination of Plaintiff's Agreement. Plaintiff was deprived of his guaranteed grace period, job, salary, bonus opportunities, pay-back provisions and renewal terms by a unilateral decision to terminate an Operating Partner for reasons that are genuinely in dispute. *Compare*, [DOC 19] p 10, *citing*, *e.g. Nat'l Mfr. &Stores Corp. v. Whitman,* 93 F.2d 829, 831-832 (4th Cir.1938).

Moreover, "ratification" must be done with full knowledge that the acceptance of benefits or the performance arises pursuant to the agreement and is done "without any duress". *Id.* [DOC 19] *citing, e.g., Honeycutt v. Honeycutt*, 208 N.C. App. 70, 80-81, 701 S.E.2d 689, 695-696 (N.C. Ct. App. 2010). As "the Court will not discredit the allegation of duress", a jury should decide whether John Curtis received any benefits from the MTA, had "full knowledge" of the "acceptance of benefits" and whether his performance was pursuant to a valid agreement procured "without any duress". *See*, Restatement (Second) of Contracts § 53(3) (cmt. b) (1981) (offeree may guard against an unintended acceptance by simply communicating to the offeror that he does not intend to assent). *See, Galloway v. Santander Consumer USA, Inc.*, 819 F.3d 79, 87 (4th Cir. 2016). "This was not a case, after all, in which the parties were engaging in back-and-forth negotiation over what the terms of a new agreement would be." *Id.* Curtis did communicate to Defendant that he did not intend to assent, but had no bargaining power under the circumstances and once terminated, he still had to feed his family. The reasonableness of the conduct and beliefs of the parties

16

should be decided by a jury; summary judgment was improper. The district court ruled that Plaintiff's evidence (or allegations) of fraud also fail to defeat summary judgment. "It is irrelevant and immaterial whether Defendant decided to terminate the Agreement before (as argued in Plaintiff's response in opposition to the Motion) or during the September 16, 2014 meeting." (JA1781). Since the termination was communicated to start the meeting, the MTA's substantive statements are false; the termination was not by "mutual consent" and the "writing" is not "genuine" evidence of compliance with Section 12(a).  The Order boldly rules that "[t]he only relevant fact is that the parties entered into the Mutual Termination Agreement, and that fact is undisputed." *Id*.  If by "entered into" the court means "signed by Plaintiff", then the statement may be factually correct, but still legally in error, as the court will not disparage Plaintiff's evidence of "duress". The document does not show that "Café Enterprises, Inc.", the named party with whom Plaintiff contracted, "entered into" the "Mutual Termination Agreement" at all.  (JA 1781).

Additionally, the Order states that the district court will not even address Plaintiff's "arguments" that Defendant "lacked cause" to immediately terminate Plaintiff's employment" because the parties "entered into the Mutual Termination Agreement in lieu of immediate termination for cause." (JA 1783). Such logic is circular.

The only consideration offered by Defendant for the "MTA" was for Plaintiff to be able to avoid a termination for cause.  If that cause was lacking (because Defendant had no "reasonable belief" that Plaintiff had committed an "Intentional Violation"), then it was either without valid consideration or procured by fraud (the knowingly false representation of "manipulation" or "padding" the payroll).  Section 12(c)does not permit a negotiated "notice period" or severance pay for intentional "Cause", but calls for "immediate termination". The Corporation simply used a false reason as leverage to terminate the contract.  Defendant did not provide any evidence that Plaintiff "intentionally violated his agreement"; failing to reduce Admin hours, and changing a job code without altering an employee's rate of pay (as reflected in the MTA) could not affect the payroll dollars (which was within Plaintiff's bailiwick, anyway).   The district court's failure (and refusal) to address the Plaintiff's evidence of fraud in rendering summary judgment was reversible error.

The district court credited that "Plaintiff gave $25,000.00 as consideration for the Agreement, which provided that incentive payments would be calculated by Defendant and paid to Plaintiff."   "The nature of these facts" the court conceded, "likely has some bearing on whether a fiduciary relationship existed between Plaintiff and Defendant" (or in the light most favorable to Plaintiff, evidence of a fiduciary relationship exists).  JA 1785, *cf.*, JA 1784, (citations omitted.)

18

The court found no evidence that Defendant took advantage of its position of trust in curtailing the future salary and "Incentive Amounts" owed to Plaintiff until the "Termination Date" of June 27, 2016. However, the same Corporate Defendant "directing" Plaintiff's use of staff labor was charged with determining and calculating the percentage of "profits after controllables" owed to Plaintiff under the Agreement.  This is the same party whose "cause" for termination is defined by a "reasonable belief" and in whose discretion the Plaintiff's performance would be judged.  The same evidence that supports a "bad faith" motive in fabricating a false cause for early termination (or in calculating the "PAC", or re-defining "controllables", or micro-managing an Operating Partner's discretionary duties) demonstrates the advantage taken of that "position of trust" by eliminating Plaintiff's contractual rights in employment, salary, and future Incentive Amounts. Defendant's abuse of discretion, lack of reasonable belief and bad faith conduct does not arise solely out of the employment relationship, but out of a contractual relationship where a 5-yearterm of employment was both a term and recited consideration for the Agreement. Plaintiff tendered genuine evidence and summary judgment was improper.  Contrary to the statement in the Order (JA 1788), North Carolina law recognizes that a breach of contract accompanied by fraud." Where the breach also constitutes an independent tort, punitive damages may be available." *See, e.g., Newton v. Standard Fire Ins. Co.*, 291 N.C. 105, 111, 229 S.E.2d 297, 301

19

(1976) (even though an identifiable tort also constitutes, or accompanies, a breach of contract, the tort itself may give rise to a claim for punitive damages").The North Carolina Supreme Court has held that "the statement of an intention to perform an act, when no such intention exists, constitutes misrepresentation… and …may furnish the basis for an action for fraud if the other elements of fraud are present….*Unifour Construction Services v. Bellsouth*, 594 S.E.2d 802, 163 NC App. 657 (N.C. App., 2004).  The Defendant's representation and argument that Curtis was subject to "for cause" termination furnishes a basis for fraud in this case. The testamentary and documentary evidence of articulated false statements and misrepresentations raises the issue of aggravated the breach of contract by Defendant.  (JA 29-32)  The court erred on both the facts and the law of "aggravated breach of contract" under North Carolina law.

Because summary judgment was granted for Defendant as to all of Plaintiff's claims, the court found no basis upon which punitive damages could be granted. N.C. GEN. STAT. § 1D-1.(JA 1792).  The court erred.  Plaintiff is entitled to present claims for punitive damages if, but only if he recovers damages on his claims for "fraud" "breach of fiduciary duty/constructive fraud" or other "egregiously wrongful acts in accordance with Chapter 1-D of the North Carolina General Statutes.

The Agreement promised the title of "Operating Partner" and the job of General Manager for five full years, a mid-five-figure salary during that time with a

20

monthly piece of the pie, and a final "parting bonus". Plus, at the end of the five-year term, the Operating Partner could "re-up" for another 5 years at half the price of those initially investing in such an Agreement. "AsanOperatingPartnerPlaintiffqualifiedforandwaspaid$108,273.98inIncentivePay. "( [DOC 19] Def's Memo at p. 4; JA 1028, 223, 1739].

Plaintiff's evidence of damages shows he was deprived of his opportunity to work as an Operating Partner- General Manager through the end of the five-year term, and was denied guaranteed future salary (minimum $52,000 annually); monthly incentive payments (4% of PAC > 18%+); and an amount "equal to ten percent (10%) of the average PAC for the last two (2) years of this Agreement"); with the option to renew his Operating Partner and Employment Agreement for another five years. (JA 55-56, 63).

As to Plaintiff's eighth cause of action ("Count VIII: Action for an Accounting"), the court adopts Defendant's literal misstatement in the Agreement:

> "Section 4(f) of the Agreement provides that "the Operating Partner hereby acknowledges that the Incentive Amount ... does not constitute an ownership interest of any kind in the Corporation or any specific assets of the Corporation."

JA 1792. Section 4(f) of the Agreement actually states "that the Incentive Amount in Subsection 4(b) above does not constitute an ownership interest of any kind in the Corporation…" JA 1731 (emphasis added). However, there is no "Incentive

21

Amount in Subsection 4(b) above".  The "Incentive Amounts" of subsection 4(c), however, do provide for an express right to share in the profits of the Restaurant, subject to the Corporation's good faith determination and calculations.  The district court recognized that "a partner may seek an accounting "if he is wrongfully excluded from the partnership business or possession of its property by his copartners." JA 1793, *citing* N.C. GEN. STAT. § 59-52. The court is simply wrong in saying, "Here, the Agreement clearly and expressly provides that Plaintiff is not in a partnership with Defendant and has no ownership interest."  JA 1793.It clearly and expressly does not.  The contract reference was simply wrong and the paragraph is rendered meaningless. Plaintiff's evidence (including the rest of the language in the Agreement) create a genuine issue of material fact as to whether Plaintiff is entitled to an accounting for his promised share of the PAC for the entire term of the Agreement (or at least "for the last two years of this Agreement", from 09/16/2012 until 09/16/2014) as determined, calculated, and prematurely terminated by the Defendant Corporation.  *See*, JA 1736, Subsection 13(c). After all, "[t]he receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business…"  [Doc. 27] at 8, citing e.g., N.C. Gen. Stat. Ann. § 59-37 (emphasis added); S.C. Code Ann. § 33-41-220; *See also, Peed v. Peed*, 72 N.C. App. 549, 553, 325 S.E.2d 275, 279 (1985).

22

The court expounds that Plaintiff has no "federally protected right to 'just cause' protection" and "is not entitled to relief simply because he disagrees with his employer's employment decisions, as if there were no contract here.  In order "to prevail" the court says, Plaintiff must "demonstrate that his private employer's adverse decision resulted from "some sort of . . . prohibited discriminatory animus," violated some federal statutory right, or violated a similar (or broader) state law right." *Id.* (Such as, "breach of contract", perhaps?)

> "In North Carolina, "absent an employment contract for a definite period of time, both employer and employee are generally free to terminate their association at any time and without reason. …**The Court's review of this matter must be guided by these principles**."

JA 1777-1778 (citations omitted) (emphasis added).  Yet, "these principles" are immaterial to this case, which concerns a 5-year "contract for a definite period of time" (and not the "employment at will" doctrine), the admitted premature abbreviation of that "definite period of time", and the damage resulting from breach of contract and related torts claimed under state, not federal law.  The court was misguided. Summary Judgment for Defendant was improper.

The court's apparent affinity for "at will" employment law, or the wholesale acceptance of Defendant's specious arguments resulted in the further disregard for basic rules of contract construction and the law of partnership, causing the court to

erroneously enter summary judgment on Plaintiff's claims for equitable and declaratory relief.

### C. THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING PLAINTIFF'S MOTION TO ALTER, AMEND OR CORRECT THE SUMMARY JUDGMENT ORDER, AND IN DENYING RELIEF FROM JUDGMENT.

The record, including the evidence specifically forecast and recited by Plaintiff in responding to the summary judgment motion [Doc 23-2] through [Doc. 23-25], was itemized, noting the district court's clear errors of law and evidence, seeking relief from the summary judgment order, prior to taking appeal [Doc. 34] at 4-22.The Order contains numerous mistakes and appears to be the result of fraud, misrepresentation or misconduct by Defendant. The Order should be corrected as to clear errors of law and to prevent manifest injustice.  Genuine issues of material fact exist, and should be decided by a jury at a trial of this action.  The district court's Ruling as a matter of law is not a reasoned decision supported by common sense, logic or the evidence presented.

The denial of a motion to alter or amend under Fed. R. Civ. P.59(e) is reviewed for abuse of discretion.  *Collison v. International Chemical Workers Union*, 34 F.3d 233, 236 (4th Cir. 1994); *Hutchinson v. Staton*, 994 F.2d 1076, 1081 (4th Cir. 1993)( courts have recognized… grounds for amending an earlier judgment… to correct a clear error of law or prevent manifest injustice); [Doc. 41]

24

at 1-2,  Rule 59(e) provides an efficient mechanism by which a trial court judge can correct an otherwise erroneous judgment without implicating appellate process and any motion which enables trial judge to reconsider validity of judgment and to vacate or alter as he sees fit is valid.  *Clipper Exxpress v Rocky Mt. Motor Tariff Bureau,* 674 F2d 1252 (1982, CA9 Cal).

Rule 60, which provides for "Relief from a Judgment or Order" states that the court may correct …a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record and may relieve a party "on motion and just terms, … from a final judgment, order, or proceeding for *e.g.,* mistake, inadvertence, surprise, or excusable neglect;… fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;…or, any other reason that justifies relief. USCS Fed Rules Civ. Proc R 60(a) and (b)(1), (3) and (6).

The district court repeatedly substituted its judgment for that of a jury, touting Defendant's witnesses and documents, even where self-contradicted.  The order discredited Plaintiff's evidence, decrying that no support in the record was cited. But see [Doc 23-2] through [Doc. 23-25], and [Doc. 34].  The Order is couched in terms of matters "argued" and "refuted" by the parties, rather than identifying the "evidence" and materials of record; and seems to be applying the Rule 12 standard (for stating a claim upon which relief can be granted as a matter of law) rather than

determining whether the parties' material disputes are supported by genuine evidence.

Moreover, the Order argues equitable principles, while ignoring the unequal bargaining power and admitted "duress" imposed by Defendant. Defendant's own evidence and that recited by Plaintiff, reveals unclean hands and a failure to do equity. Such an application results in a manifest injustice. Plaintiff amply supported his claims with documents, deposition testimony and the admissions of Defendant. *See*, [Doc. 23-2] *and* [Doc. 23-3] through [Doc. 23-25] as cited in [Doc. 23-1] and [Doc. 23-2]; [Doc 34]. Moreover, the existence of "Cause" is defined as the Corporation's "reasonable belief" of failed performance or intentional violations. Plaintiff has tendered evidence that no valid Cause existed, raising issues of Defendant's the motive, intent, state of mind, and credibility precludes summary judgment."…[S]ummary judgment is rarely appropriate in actions in which the litigant's state of mind, motive, or subjective intent is an element of [the] plaintiff's claim." *Fortress Re, Inc. v. Cent. Nat'l Ins. Co. of Omaha*, 766 F.2d 163, 166 (4th Cir. 1985) ("[A] subjective standard for determining whether an insured acted in good faith makes it unlikely that the issue can be resolved by summary judgment."). As in this case, where the issues of a material fact turn on credibility, summary judgment is not appropriate.

26

The Court's refusal to address Plaintiff's evidence showing "that Defendant lacked cause to immediately terminate Plaintiff's employment because the parties entered into the Mutual Termination Agreement in lieu of immediate termination for cause is a tautology and not a "reasoned decision". *See*, JA 1783. The refusal to correct clear error and/or manifest injustice, rather than inviting this appeal, seems an abuse of the court's discretion. If the Corporation "lacked cause to immediately terminate Plaintiff's employment" then the parties entered into the "Mutual Termination Agreement" "in lieu of" a lie, and the Corporation offered Plaintiff an ultimatum in bad faith. But Plaintiff was not immediately terminated for cause, he was only threatened with termination "for cause" that was invalid.

"Cause" was the basis for the announced discharge and termination of the Agreement; "Cause" was the consideration for the "Mutual Termination Agreement"; "Cause" was the false premise by which Defendant exerted "duress" and extorted Plaintiff's signature. Disregarding the underlying basis for a highly questionable and hotly disputed termination of a 5-year contract, especially when based on a challenged document that is facially invalid appears to be an abuse of discretion.

The primary mistake at the heart of the ruling, was adopting the self-proclaimed (and self-determining title) "Mutual Termination Agreement". (JA 1775-1776 (referring to JA 1726).By accepting the Defendant's spin (that the

27

termination was by mutual consent under Section 12(a) as evidenced by the Plaintiff's (unwitnessed) signature, the district court decides the entire case, despite acknowledged duress, Plaintiff's voiced objections, the absence of Defendant's signature, the blatantly false presentation showing the signature as "witnessed" and the underlying premise for the entire process (that Plaintiff was subject to immediate termination). These numerous overt factual and legal flaws give rise to genuine issues about the document's validity and veracity. This one mistake overshadows all other facts, circumstances, and claims in the case and is largely responsible for the repeated error which manifests itself throughout the Order.

The district court sided with Defendant at nearly every turn, usurping the jury's province as to the weight of conflicting evidence and the credibility of opposing witnesses. JA 1779 ("Defendant argues that... Defendant could have terminated Plaintiff for-cause"). JA 1784 ("Defendant effectively refutes Plaintiff's claim"), JA 1788 ("Defendant refutes the allegations and argues…"), and, JA 1789-1790 ("Defendant argues that Plaintiff was paid everything to which he was entitled", swallowing whole the Declaration of Donald Camacho, Defendant's Chief Financial Officer" who gave conflicting deposition testimony (JA 69 ¶ 13(c)("…the Corporation will pay the Operating Partner an amount equal to ten percent (10.0%) of the average Profit After Controllables ["PAC"] for the Restaurant for the last two (2) years of this Agreement")(JA 371).

28

Pursuant to Local Rule 34(a), the Appellant would like to request that oral argument be heard in this appeal.

## CONCLUSION

The district court erred in granting summary judgment on all of Plaintiff's state law claims for breach of contract and related torts, where Plaintiff presented genuine evidence that Defendant's premature termination of Plaintiff's Operating Partner and Employment Agreement was not "in accordance with Section 12" thereof, and that the breach of contract of a five-year term contract was aggravated by the related torts (including fraud, bad faith and/or a breach of fiduciary duty).  Plaintiff, John Curtis should be given his day in court.  The district court's Order granting summary judgment should be REVERSED, relief from judgment allowed (and the Judgment VACATED), and the Order denying such relief should be REVERSED as an abuse of discretion in the form of mistakes, clear errors of law and to avoid a manifest injustice.

/s/ William E. Moore, Jr.
N.C. Bar No. 9962
Gray, Layton, Kersh, Solomon, Furr, & Smith, P.A.
516 South New Hope Road, Post Office Box 2636
Gastonia, NC 28053
Phone:        (704) 865-4400
Fax: (704) 866-8010
E-mail: bmoore@gastonlegal.com
***Attorney for Plaintiff, John Curtis***

29

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
### Effective 12/01/2016

No. _____    Caption: _____

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

---

**Type-Volume Limit for Briefs:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

---

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

---

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

---

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[  ]    this brief or other document contains _____ [*state number of*] words

[  ]    this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[  ]    this brief or other document has been prepared in a proportionally spaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*]; **or**

[  ]    this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s)_____

Party Name_____

Dated:_____

## CERTIFICATE OF SERVICE

I certify that on July 17, 2017, the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy of the addresses listed below:

J. Michael Honeycutt
FISHER & PHILLIPS LLP
227 West Trade Street, Suite 2020
Charlotte, NC  28202
mhoneycutt@fisherphillips.com

/s/ William E. Moore, Jr.
N.C. Bar No. 9962
Gray, Layton, Kersh, Solomon, Furr, & Smith, P.A.
516 South New Hope Road
Post Office Box 2636
Gastonia, NC 28053
Phone: (704) 865-4400
Fax: (704) 866-8010
E-mail: bmoore@gastonlegal.com
***Attorney for Appellant-Plaintiff, John Curtis***