RECORD NO. 17-1698

IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

**JOHN CURTIS,**

*Plaintiff-Appellant,*

v.

**CAFE ENTERPRISES, INC.,**
**d/b/a Fatz Cafe, f/k/a Fatz Cafe, Inc.,**

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF NORTH CAROLINA AT STATESVILLE

REPLY BRIEF OF PLAINTIFF-APPELLANT

William Everett Moore, Jr.
GRAY, LAYTON, KERSH,
 SOLOMON, FURR & SMITH, PA
516 South New Hope Road
P. O. Box 2636
Gastonia, North Carolina 28053-2636
(704) 865-4400 (Telephone)
bmoore@gastonlegal.com

Counsel for Plaintiff-Appellant

# **TABLE OF CONTENTS**

TABLE OF CONTENTS…………………………………………………….. i

TABLE OF AUTHORITIES…………………………………………………… ii

ARGUMENT

       A.     REPLY TO APPELLEE'S RE-STATEMENT OF FACTS……….. 1

          1.   *MEA CULPA*…………………………………………….. 1

          2.   RECORD CITATIONS TO MATERIAL FACTS…………… 2

          3.   SUMMARY OF ARGUMENT IN REPLY………………… 13

CONCLUSION………………………………………………………….. 26

CERTIFICATE OF COMPLIANCE………………………………………….. 28

CERTIFICATE OF SERVICE………………………………………………... 29

# TABLE OF AUTHORITIES

<u>FEDERAL CASES</u>

*Adam v. Wells Fargo Bank, N.A.*,
    901 F. Supp. 2d 623 (D. Md. 2012)…………………………………………… 22

*Carlson v. Gen. Motors Corp.*,
    883 F.2d 287 (4th Cir. 1989)……………………………………………… 23

*King v. Rubenstein*,
    825 F.3d 206 (4th Cir. 2016)……………………………………………… 24

*Schneckloth v. Bustamonte*,
    412 U.S. 218, 93 S. Ct. 2041 (1973)……………………………………… 24

*St. Paul Reinsurance Co. v. Rudd*,
    67 F. App'x 190 (4th Cir. 2003)………………………………………….. 19

*United States v. Maurice*,
    26 F. Cas. 1211, 1823 U.S. App. LEXIS 350,
    2 Brock. 96 (C.C.D. Va. May 1, 1823)…………………………………… 23

*Villa v. CavaMezze Grill, LLC*,
    858 F.3d 896 (4th Cir. 2017)……………………………………………… 14

**STATE CASES**

*Caplan v. Stant*,
    207 Va. 933, 154 S.E.2d 121 (1967)……………………………………… 21

*Duggin v. Adams*,
    234 Va. 221, 360 S.E.2d 832 (1987)……………………………………… 21

## ARGUMENT

### A.  REPLY TO APPELLEE'S RE-STATEMENT OF FACTS

Café Enterprises, Inc. Defendant-Appellee (the Corporation) fails to demonstrate the absence of genuine issues of material fact and an entitlement to judgment as a matter of law, as necessary to sustain the order granting summary judgment entered by the district court.  *See*, Brief of Appellee, Appeal: 17-1698 Doc: 18, filed 8/14/2017, pp. 1-65. Rather, the gist of the Corporation's argument appears to be an incorrect and hyper-technical attack on the record citations in the Opening Brief of Plaintiff-Appellant (Doc: 14).  Appellee's Brief, pp. 1-4, 14-17, 25, 29-34-38, 39, 45; (Doc. No. 18) pp. 14-17, 27-30, 38, 42-47, 51-52, 58.  The repeated reliance on the fact that the district court decided genuine issues of fact (and credibility) in favor of the party moving for summary judgment, and the regurgitation of the false assumptions and inferences adopted by the trial judge is of no avail to Appellee, and instead, demonstrates why the lower court must be reversed upon a *de novo* review of the record and proper application of the summary judgment standard.

### 1.  *MEA CULPA*

While misguided as to the number and effect of scrivener's errors in the Brief of Appellant (Doc 14), Appellee's Brief does identify a number of record

1

citations that appear to have been mis-printed or transposed in the Appellant's printed brief.  *See*, (Doc 14) pp. 3-5, citing (JA 264-266, 315, 316-318, and 543.) Counsel for Appellant must take full responsibility for these glitches and the undersigned hereby acknowledges and apologizes for the inconvenience generated by any miscommunications to the printer, the Court and opposing counsel. Fortunately, Counsel for the Appellee was kind enough to correct the record cites in a few instances, and careful enough not to argue that the disputed facts are not contained in the record, but only that the locations of such facts in the Joint Appendix were mis-cited.  The following citations to the Joint Appendix are intended to correct any such typographical errors in the principal brief, to affirm the correctly cited testimony and documents therein, and to demonstrate the existence of genuine issues of material fact, as shown of record, entitling John Curtis, Plaintiff-Appellant to a trial on the merits of his case.  The district court's order granting summary judgment on all claims is erroneous and should be REVERSED.

## 2. RECORD CITATIONS TO MATERIAL FACTS

Appellee overlooked the following citations to the record that are obvious from the face of the documents referenced or which appear at the end of the encompassing paragraphs; where errors or omissions were made, the intended

2

citations appear as follows:

1) "The Amendment was signed by 'Café Enterprises, Inc.'" (Appellant's Brief, p. 3)

(Doc 18) p. 1. Appellant's Brief correctly cites the first page on which the "Operating Partner and Employment Agreement Amendment" appears in the Joint Appendix "(JA 1739)". The signatures actually appear on the second page of the document and the formal "Acknowledgement" is on the third page. While the shorthand citation requires a page turn (where the last sentence from the cited page continues), a pinpoint cite (JA 1740), or a full reference (JA 1739-41) would have been more accurate. The point of fact at issue on appeal, however, is the distinction between:

- the proper form and substance of the "Amendment" signed, "Café Enterprises, Inc. by its Vice-President of Human Resources" (JA 1740), a three-page legal document altering specific paragraphs of the parties' underlying ten-page "Operating Partner and Employee Agreement", the contract claimed to have been breached here (JA 55-65); and

- a one-page, self-styled memo, mischaracterized as a "Mutual Termination Agreement" whose form, substance, "mutuality" and validity was expressly challenged by this lawsuit, and which contains no reference to, much less

3

the signature of "Café Enterprises, Inc.", a required party to any modification or termination of the underlying Agreement. *Compare*, (JA 109), *with* (JA 60), ¶ 12(a) ("this Agreement may be terminated by the mutual written agreement of the Operating Partner and the Corporation"), (JA 65) ¶ 22 ("any such amendment to be invalid unless in writing, signed by the Corporation and the Operating Partner") *and* J.A. 55 (defining, "Corporation" as, "Café Enterprises, Inc.").

The self-proclaimed "Mutual Termination Agreement" is signed by an individual, J. Richard Cannon, identified as "Chief Operating Officer Fatz Café" (JA 109). The name, "Fatz Café", is found nowhere in the "Operating Partner and Employment Agreement" (JA 55-65); the name, "Café Enterprises, Inc." is found nowhere in the misnamed "Mutual Termination Agreement" (JA 109). Genuine issues abound as to the authenticity, validity and effect of the paper writing that appears at page 109 of the Joint Appendix, merely from a comparison with a valid "amendment... in writing, signed by the Corporation... ." *Compare*, (JA 1739-41) *with*, (JA 109).

2)   "Cannon prepared two different versions of a termination notice." (Appellant's Brief, p. 3).

3)   "Cannon 'started the meeting by acknowledging to [Curtis] that he was going to be terminated for intentional violation of his contract . . . trying to manipulate payroll.'" (Appellant's Brief, p. 4). ).

4

4) "Cannon then offered two different 'termination agreements,' one of which would have taken effect immediately, and a second which allowed [Appellant] to finish out the month." (Appellant's Brief, p. 4). ).

5) "He reported that Curtis 'opted to agree to support Lincolnton in his Operating Partner capacity until inventory was completed on September 29, 2014, at which time the termination would be effective.'" (Appellant's Brief, p. 4). ).

(Doc 18) p. 1. Appellant's Brief correctly cites the page of the Joint Appendix on which an email from the Corporation's Area Partner, Chip Hoskins, confirmed that, "Richie [Cannon] started the meeting by acknowledging to John that he was going to be terminated for intentional violation of his contract", and that "Richie offered two different termination agreements, one of which would have taken effect immediately, and a second which allowed John to finish out the month thus making him bonus eligible for September." (JA 112-13). The citation is at the end of the full paragraph on page 4 of the brief, and identifies genuine evidence (an evidentiary admission of a party opponent) which covers all of the above statements of fact (Appellee's ¶ "2) - 5)", above.)[1]

Significantly, the Appellee does not challenge the "fact" that two different versions of the so-called, "Mutual Termination Agreement" were prepared and

---

[1]    Admittedly, there are additional page references that were intended to cite cumulative sources of corroborating, evidence, but which were either mistaken, wrongly transcribed, or transposed. *Mea Culpa*. Nonetheless, it is patently false that these "allegations of fact [are] without any citation to the record" as argued in the Brief of Appellee at (Doc 18) p. 1.

5

tendered to Curtis, but only harps because it did not find the record citation on the succeeding page.  These facts are material because they prove the "ultimatum" or "Hobson's Choice" foisted upon the Operating Partner after "acknowledging to John" that his "Operating Partner and Employment Agreement" was being terminated.  Appellee challenges the form of Appellant's citations to facts, which were known to be supported by genuine evidence in numerous places throughout the record, in addition to the primary and sufficient citation falsely attacked (JA 112).  *See, e.g.*, (JA 217-18, 1124-25) [Hoskins Deposition]; (JA 808) [Cannon Deposition]; *cf.*, (JA 807-810) [Cannon's version of the termination] *and*, (JA 109) (the second of the "two different termination agreements" signed by Curtis).

6)    "Appellant testified that he 'was forced to sign this agreement.'" (Appellant's Brief, p. 4).

7)    "He said he wasn't going to sign this agree[ment] or the other agreement, and Mr. Cannon said that they were not leaving this room until Appellant signed one, and that Curtis had a choice." (Appellant's Brief, p. 4).

8)    "He said, he didn't 'agree with any of this. This is bullshit.'" (Appellant's Brief, p. 4).

9)    "He said, 'I am being railroaded. You-all know [I] am. This is Bull.'" (Appellant's Brief, p. 4).

10)    "Appellant then said, 'I'll agree to disagree, but I'm not agreeing' and Cannon said, 'You will agree.'" (Appellant's Brief, p. 4).

11)    "That's what Appellant was told." (Appellant's Brief, p. 4).

6

12) "Appellant testified that he had signed one of the 'agreements' while he was at the home office, but it was 'the wrong agreement' and then he had to go back and get the right agreement" (Appellant's Brief, p. 4).

13) "Appellant testified, 'I signed both agreements.'" (Appellant's Brief, p. 5).

14) "When asked if somebody put a gun to his head, he responded, 'Well, when I first found out I had to go there, I asked if I should bring a lawyer and was told by Gary Tate that I didn't need a lawyer. So after further review, I did need a lawyer, and they put me in a spot where, had I known I could have just got up and walked out and not signed either one, and everything. . . I would have done exactly that. But yes, I was forced to sign this paper.'" (Appellant's Brief, p. 5).

(Doc 18) pp. 1-2.  The record clearly shows that Plaintiff-Appellant John Curtis testified to all of the above facts as stated, *see*, (JA 1016-1018).  Counsel for Appellee has personal knowledge of the fact that Plaintiff-Appellant, John Curtis so testified, because he elicited each one of the above quoted facts by his own questioning. *Id.*; *see e.g.*, (JA 1015) [Deposition of John Curtis, page 200 line 7 ("BY MR. HONEYCUTT")].  Inexplicably, page 5 of the printed brief of Appellant points to "(JA 316-318)" of the Joint Appendix, but should read: "(JA 1016–18)",[2] where the deposition testimony of Plaintiff-Appellant John Curtis is clearly found.[3] (Fortunately, these same material facts are correctly cited on page

---

[2]    *Mea Culpa...*

[3]    Other typographical errors also appear in the printed briefs, such as the passage: "He said he wasn't going to sign this agree mentor [*sic*] the other agreement" (Doc 14) p. 4 (correctly rephrased by Appellee as, "He said he wasn't going to sign this agree[ment] or the other agreement…" (Doc 18) pp. 1).

13 of Appellant's Brief as "(JA 1016-18)" as genuine evidence of "duress", adequately disputing the validity of his "forced signature as something other than evidence of mutual consent or an "arms' length" transaction, precluding summary judgment.) Rather than providing the Court with the correct citation to the known evidence, however, Appellee suggests that "all of these factual allegations should be disregarded." (Doc 18) p. 2.

Appellee necessarily relies on superfluous scrivener's errors and its own cavalier disregard of known evidence (including correct citations), to confute the above-stated facts of record, because unless the material evidence above is somehow excluded from consideration, material disputes appear to exists over the validity and execution of the mislabeled "Mutual Termination Agreement". The eyewitness's testimony, is consistent with other evidence of record, and if believed, would clearly prove:

- that the "Mutual Termination Agreement" proffered by Defendant-Appellee, Café Enterprises, Inc., appending two witnesses' signatures (JA 109-110)), was not the document first signed and actually witnessed by Appellee's Area Partners (Hoskins and Tate) *but cf.,*(JA 1068) [nobody was present except John Curtis and Richie Cannon, when the first signed document was returned and the second document was signed] *and* (JA 1069) ["we did the old switcheroo with the papers"], *with* (JA 1576-81)

8

[Tate testified that there were two printed agreements when that meeting began, he had no input into the decision of termination or the two prospective "agreements"; he signed it as a witness, but first saw, and only read one of the "agreements" at the meeting (and did not ever read the other "agreement"); Tate did not "remember that John signed the wrong one and had to come back"; and, testified that he "had nothing to do with" the decision to terminate the Operating Partner and Employee Agreement or "the meeting of September 16th where John Curtis was called in and given an ultimatum to either be terminated immediately or to sign this other agreement that said he could work for two more weeks"]; *but cf.*, (JA 1559)["I don't recall John getting terminated…"]; compare, (JA 809-810) [Cannon, Defendants' 30(b)(6) Representative's testified that Curtis first signed the document "agreeing" to immediate termination, but brought it back; Defendant "trashed" the document, and no copy is known to exist].

- that the purported "Mutual Termination Agreement" was neither "Mutual" nor voluntarily entered at arms' length, but was signed under verbal threat of physical force *cf. also,* (JA 1064) ["It was not my choice"; (JA 1065-66) ["I signed both of them, yes, because I was told that I was not leaving until I signed a document…  I said I'm not agreeing with what's in here, but…"]; (JA 1066) ["…Yes, I did feel threatened"];

- that the parties did not "agree it is best that we terminate the Operating Partner Agreement" nor "agree to the …provisions" which were offered as an ultimatum in lieu of a termination for a false "Cause" (JA 1131-32) [Hoskins: "those were his only two options… Yes, sir."]; *cf.,* (JA 1559) [Tate testified: "Richie asked John about switching the admin hours… trying to change the coding of the admin hours"], (JA 1569) [Tate admitted: "Right. Yes" that "Café Enterprises permitted its stores… to have personnel on their payroll that could be clocked in either as hourly staff or administrative or admin hours"];

- that there was no real "choice" in agreeing to either one of two false bases of termination, both of which were contrary to the express provisions and procedures found in the "Operating Partner and Employment Agreement") *Compare,* (JA 60-63) [Section 12, "Termination" through Section 13, "Payments Upon Termination"] *with,* (JA 1064) ["It was not my choice. He said I was signing one or the other. …He was telling me that I had to sign one or the other. Yes, sir."]; and

- that the documents were both tendered and required to be signed *after* the termination of the Agreement (and that of his employment) had already been decided by Cannon and "acknowledged" to Plaintiff-Appellant John Curtis (JA 1071) ["basically the first words out of his mouth that I was

going to be terminated for violating my contract"]; *cf.*, (JA 112, 1747) [Deposition Exhibit 49 (Hoskins email): "Richie started the meeting by acknowledging to John that he was going to be terminated for intentional violation of his contract"]; *See,* (JA 1014-23) [Plaintiff-Appellant's testimony regarding his termination and the signing of the documents on September 16, 2014]; *but see,* (JA 1576 - 1582 [Area Partner, Gary Tate's testimony regarding his recollection (or lack thereof) concerning the events of September 16, 2014].

15)    "The first document was signed and witnessed (confirming immediate termination for "intentional violation of his contract"), Appellant was allowed to leave." (Appellant's Brief, p. 5).

(Doc 18) pp. 1-2. *See*,  (JA 807-812) [When asked if he was "making it clear to Mr. Curtis that if he didn't agree to be terminated after two more weeks that he would be terminated on the spot?" Richie Cannon testified: "I made it clear to him that, based on his actions, we would no longer be working together, yes, sir"]. *See, e.g.*, (JA 1016-1018, 1064-1068) [Plaintiff-Appellant's deposition testimony].

Appellee then spends two pages highlighting other genuinely disputed material facts, claiming first that Plaintiff-Appellant's recitation of breached contract terms "misinterprets the parties' Agreement." (Doc 18) p. 16 "i)" and tacitly urging the Court to draw all inferences in favor of Appellee, the party moving for summary judgment, suggesting that all such misinterpreted

ambiguities should be resolved in favor of the party who drafted the Agreement, when the established law and procedure under Fed. R.Civ.P. 56 requires just the opposite.

Second, Appellee cherry-picks portions of one "Position Description", again complaining that an obvious transposition in typing the numbers is a fatal error (JA 1179 should read: JA 1719), yet failing to "un-ring the bell" that the "Cause" for termination by which Plaintiff-Appellant was coerced into accepting two weeks of work was false and contrived. The use of admin hours was permitted and practiced at Café Enterprises, Inc.'s restaurants and had been disclosed by Curtis to Tate (JA 1567-69, 1658-60; 1700-02); that the job code designation was changed without effecting payroll (JA 812); but see (JA 109) ["[t]he direction was to reduce the dollars spent on hourly associates…" and "John simply changed the job code"]; and that such decisions were within the authority and discretion of the Operating Partner. *See*, (JA 800, 807, 810, 1550, 1684, 1700-01, 1719 and 1746).

Appellee argues that the termination was not for "Cause" because of performance. However, the underlying reason for termination (a failure to remove administrative hours) was, in fact, an unwritten "staffing" performance issue, and was the subject of discussion and discipline at practically all of the nine stores in the Area, but never a reason for termination. (JA 1497-98, 1567, 1672, 1683-84, 1700-01). Termination for cause because of performance was controlled by

12

Subsection (c)(i), however, and required a 30-day "Deficiency Notice" and an opportunity to cure any specified deficiencies, which admittedly was not given. (JA 61, 807; 1132). Termination for cause was specifically defined by Subsection 12(c)(ii) of the Agreement, was not discretionary, was immediate, and was subject to immediate arbitration. (JA 61-62). Nowhere does the Agreement allow a false claim of "Cause" to serve as the basis for extorting an existing Operating Partner into accepting a two-week notice provision in lieu of immediate termination. *See*, (JA 55-65).

Appellee admits that "Cannon indicated to Appellant that Café Enterprises, Inc. was either going to terminate him immediately or the parties could mutually terminate their employment relationship in which case Appellant would be allowed to work an additional two weeks…". Yet, Appellee insists that it presented a real choice based on valuable consideration, rather than simply a chance to minimize the damages from the announced breach of the 5-year employment term, along with the premature termination of all other incentives and guarantees found in the Operating Partner Agreement as "the lesser of two evils". Plaintiff-Appellant has raised genuine issues of whether Café Enterprises, Inc. had any "good faith" reason to "terminate him immediately" for "Cause" and whether he was entitled to the procedures and safeguards written in the Agreement, and the

benefits of that bargain, in the face of the announced decision by Café Enterprises, Inc. to terminate the Operating Partner and Employment Agreement.

## 3. SUMMARY OF ARGUMENT IN REPLY

The Appellee, having successfully misguided the trial court, again mistakenly relies on common law principles regarding "wrongful termination" and "at will" employment instead of the "breach of contract" claim presented under the written terms of the parties' "Operating Partner and Employment Agreement" and the disputed facts of how it was prematurely terminated on September 16, 2014. *See*, *e.g.,* (Doc 18) p. 36 of 65, *citing*, *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 905 (4th Cir. 2017) ("when an employer has acted for a reason that the statute does not prohibit, we do not judge the correctness, fairness, or wisdom of the employer's decision").

In addition to specifying how, and under what conditions the Agreement may be properly terminated, the stated term of five years for the employment and title of Operating Partner, removed the relationship from the "at will" presumptions, erroneously invoked in rendering judgment as a matter of law in favor of Café Enterprises, Inc.  (JA 55-65).  Although, the state law claim was included in the original complaint as an additional or alternative third cause of action, Plaintiff-Appellant John Curtis maintains that summary judgment is improper as to his claims for breach of contract, breach of fiduciary

14

duty/constructive fraud, breach of contract accompanied by fraud, and punitive damages, based on the genuine evidence disputing Defendants' false reasons and unauthorized procedures in effecting the premature termination of the Operating Partner and Employment Agreement.

The District Court erred in ruling as a matter of law that the so-called "Mutual Termination Agreement" was enforceable as an agreement. The paper writing upon which the Company's Summary Judgment hangs, was but one of two single-page, pre-prepared memoranda, presented as an ultimatum by the Company to its Operating Partner, after announcing the Company's decision to prematurely terminate his existing Operating Partner and Employee Agreement.   The decision to terminate the Operating Partner and Employment Agreement was already made and acknowledged to John Curtis, and the breach of that contract had already occurred before Richie Cannon ever tendered any "Mutual Termination Agreement" to John Curtis.   Curtis objected and refused to agree to the false statements, but was given no choice, but to sign, in order to leave, having already been discharged for reasons and under a procedure itself violative of the written terms of the Operating Partner and Employment Agreement.

The Appellant presented Genuine issues of material fact:

- As to the sufficiency of consideration –the Company offered to take away two year's guaranteed salary plus bonus in exchange for the OP's agreement to receive either immediate termination or receive back two more weeks of

employment, plus two week's pay); neither the bargaining table nor the playing field were level and the stated consideration was contrived and illusory.

- As to the "meeting of the minds" (the Company admits that the termination was announced before the two documents were tendered; the Operating Partner testified that the decision was not "Mutual" and that his signature had been coerced by physical threat)

- As to execution –both of the "Mutual Termination Agreements" were eventually signed, but the Company's witnesses admittedly only saw the first document signed. Nonetheless, the document the Company now claims as "The Mutual Termination Agreement" bears the witness acknowledgements from the first signed "Mutual Termination Agreement", which evidence was admittedly returned to, and destroyed by the Company.

- As to authenticity –the document does not name Café Enterprises, Inc. as a party, and no signature of the Company appears on the document; and

- As to the validity of a second document containing statements which are false and misleading, after having already announced the termination, which was signed by the non-party who drafted the Agreement without witnesses, but including a certification by absent witnesses. The record shows genuine disputes as to whether the stated reasons for discharge were valid or made in good faith, *see, e.g.,* (JA 807) [Cannon testified, "I had grounds to terminate him for cause"); whether the first document signed was as characterized by Defendants and/or superceded the second document signed with no witnesses present, and whether its destruction or non-production gives rise to genuine issues about the validity and manner of termination, *see* (JA 808-09) [Cannon testified: "I'm sure we trashed it"] stating that no copy was available on the computer because "I wrote it up on a piece of paper and printed it off" – a statement that is patently contrary to the physical evidence (JA 109) and logic.]

The district court ruled that there were no genuine issues of material fact because, "The only relevant fact is that the parties entered into the Mutual Termination Agreement, and that fact is undisputed." (JA 1781). Curtis admitted

16

that he was forced to sign a proposed "Mutual Termination Agreements" after being told his Operating Partner and Employment Agreement was being terminated for "Cause" (immediate termination), and which reasons were challenged as false, and which did not constitute "cause" for immediate termination under Section 12 of the parties' Agreement (JA 60-62). Genuine issues of material fact exist as to the form, substance, and procedure used to terminate the Agreement. The trial court erred in finding no genuine issue as to the voluntary or "mutual" nature of the premature termination of an existing Operating Partner and Employment Agreement, and it should be for a jury to say whether succumbing to the threat of immediate false termination for cause, and accepting two-weeks of employment and another two weeks of pay (already guaranteed for two more years under the Agreement) was reasonable under the circumstances, or whether accepting the pittance offered in lieu of nothing but immediate termination was valid "ratification" of the unilaterally announced decision (or an effort to minimize damages), sought to be whitewashed *ex post facto* as a voluntary and "mutual" termination. The court stated that it could not discredit the genuine evidence of "duress", yet then ruled that the dispute was immaterial because Curtis accepted the two weeks of work and two weeks of pay as the "benefits of the transaction". (JA 1782) The fallacy which Appellee asks this Court to adopt is that "a choice between immediate termination for cause and the Mutual Termination

17

Agreement [*sic*]" constituted valid and meaningful "consideration". (JA 1780). Such a choice might not be unconscionable if, but only if, the "immediate termination for cause" was legitimate (although the Agreement states that "this Agreement will terminate immediately upon the existence of Cause, defined as the Corporations reasonable belief of [listed grounds]") (JA 61). However, the record discloses a genuine dispute as to the asserted reason for "immediate termination" (changing job codes was proper for an Operating Partner and not a terminable offense, and did not affect "payroll" as stated by Defendant). This error was compounded by the district court's tautology: "The Court will not address… that Defendant lacked cause to immediately terminate Plaintiff's employment because the parties entered into the Mutual Termination Agreement." (JA 1783). Yet, the threat of immediate termination (for a false cause) was part of the leverage improperly used (breach of fiduciary duty) to gain Appellant's signature on a document designed to cover-up that Appellee "lacked cause to immediately terminate Plaintiff's employment" under the Agreement and five-year employment term (breach of contract accompanied by fraud). Summary Judgment in favor of Café Enterprises, Inc. is improper under the disputed facts of record.

Appellee and the district court repeatedly misapplied the summary judgment standard, arguing at length over "allegations" and their sufficiency, as if the matter were being decided on a motion to dismiss under Rule 12(b)(6), rather than

examining the forecast of evidence in the form of sworn deposition testimony and documentary evidence. *See*, (JA 1776-77) [reciting legal principles of "just cause", "discriminatory animus" and applying the inapposite "at will" employment doctrine: "absent an employment contract for a definite period of time…"]. The Appellee cannot be seen as entitled to judgment as a matter of law, when the correct summary judgment standard is applied to the disputed facts of the motive, state of mind, and subjective intent of the parties with regard to the affirmative defense of estoppel, in the face of genuine evidence disputing the "Mutual Termination Agreement" in this case.  The following passages are instructive, and when read together, demonstrate that summary judgment is improper in the present case; genuine issues of material fact exist and Appellee is not entitled to judgment as a matter of law, but rather Plaintiff-Appellant John Curtis should be allowed to seek the protection of the court for his claimed breach of contract, and a jury should decide which side to believe:

> Additionally, we are guided by the principle that "summary judgment is rarely appropriate in actions in which the litigant's state of mind, motive, or subjective intent is an element of [the] plaintiff's claim." ("[A] subjective standard for determining whether an insured acted in good faith makes it unlikely that the issue can be resolved by summary judgment.").

*St. Paul Reinsurance Co. v. Rudd,* 67 F. App'x 190, 194-95 (4th Cir. 2003) [*internal citations omitted*].  This is not new law, but the basic principles of

contract formation seem to have eluded Appellee and the lower court, when adopting the "Mutual Termination Agreement" as an estoppel, despite the fact that it is not signed by a necessary party, has none of the usual formalities of a contract, and was drafted by the party who imposed false statements, discounts the illusory consideration offered, and insists that because three Café Enterprises, Inc. employees successfully forced Curtis to sign his name, there is irrefutable proof of mutual consent, voluntary intent to be bound, and a waiver of any right to invoke the protections bargained for under the Agreement whose termination had already been decided and announced.

> In 17 Am.Jur.2d Contracts, § 295, p. 712, it is said: "The general rule supported by the courts is substantially to the effect that when the body of a contract purports to set out the names of the parties thereto and a person not named in the body of the contract signs the contract, and there is nothing in the contract to indicate that such person signed as a party, such person is not bound by the contract and hence is not liable thereunder."

> In 94 A.L.R.2d 691 ff. there is a comprehensive annotation under the title "Person who signs contract but is not named in body thereof as party to contract and liable thereunder." There a number of cases are collected which support the holding that such a signer of a contract was not liable thereon as a party. See Annotation, 94 A.L.R.2d, § 3, p. 696 ff. …

> ***

> It is well settled that such evidence which relates to the formation or existence of a contract between the parties is not in violation of the parol evidence rule. The parol evidence rule prohibits the introduction of extrinsic evidence to vary the

terms of a written instrument. It does not exclude evidence as to whether a valid contract has been made or entered into between the parties, which is one of the principal issues in the present case. 3 Corbin on Contracts, § 576, p. 384; Id., § 577, p. 385 ff.; 20 Am. Jur. Evidence, § 1093, p. 954. Nor does it prohibit the showing of the true relation of the parties to the contract, which is among the questions here involved. 20 Am. Jur. Evidence, § 1125, p. 980 ff.; 32A C.J.S. Evidence, § 994, p. 507. See also, Annotation, 94 A.L.R.2d, § 8, p. 712 ff.

*Caplan v. Stant*, 207 Va. 933, 936-38, 154 S.E.2d 121, 123-24 (1967).

Appellant presented genuine evidence of violations of Subsections 12 and 13 of the parties' written Operating Partner and Employment Agreement, by contriving and effectuating a premature termination thereof in bad faith. Appellant has met the burden of production necessary to overcome summary judgment:

A party to a contract has property rights in the performance of and anticipated profits from the contract, and these rights are entitled to protection in the courts.

*Duggin v. Adams*, 234 Va. 221, 225, 360 S.E.2d 832, 835 (1987) [*internal citations omitted*].

Generally speaking, "a signature is not required in order to bring a contract into existence, nor is a signature always necessary to the execution of a written contract." …[citation omitted] "There is an exception to this rule, however, when the terms of the contract make the parties' signatures a condition precedent to the formation of the contract."

\*\*\*

…Where, as here, "ambiguity is found in a contract, it becomes

21

a question of fact to decipher the intent of the parties in forming the instrument." City of Bowie v. Mie [Properties, Inc., 398 Md. 657,] 684 n. 16, 922 A.2d 509 (2007).

…A fact finder could conclude that, by signing the Modification and delivering it to Wells Fargo, Yacoubou accepted Wells Fargo's offer, creating a new contractual relationship between the parties. ...

\*\*\*

Ordinarily, when a trial court finds that a contract is ambiguous, "the meaning of the contract is a question to be determined by the trier of fact."[*citations omitted*]… But, where there is no relevant extrinsic evidence, or "if ambiguity is determined to remain after consideration of extrinsic evidence, 'it will ordinarily be resolved against the party who drafted the contract,' where no material evidentiary factual dispute exists." *[citations omitted]…* ("'It is a basic principle of contract law that, in construing the language of a contract, ambiguities are resolved against the draftsman of the instrument.'").

*Adam v. Wells Fargo Bank, N.A.*, 901 F. Supp. 2d 623, 633-35 (D. Md. 2012)

[*internal citations omitted*].

See also *Luick v. Graybar Electric Co.,* 473 F.2d 1360, 1363 (8th Cir. 1973) (plaintiff always "should be given a reasonable opportunity to present evidence" on his claim of unconscionability, after which "it is then within the province of the trial court to determine the issue") (emphasis supplied); Restatement (Second) of Contracts § 208 comment f (1981) ("A determination that a contract or term is unconscionable is made by the court in the light of all the material facts. . . . The determination is made 'as a matter of law,' but the parties are to be afforded an opportunity to present evidence as to commercial setting, purpose and effect to aid the court in its determination."). *Cf. Farkar Co. v. R.A. Hanson Disc, Ltd.*, 583 F.2d 68, 71-72 (2d Cir. 1978) ("in certain situations the

determination whether a particular provision is 'unconscionable' creates a question of fact"; court goes on to hold that "here we find no facts to support placing into the 'unconscionable' category the [disputed contractual] provision") (emphasis supplied).

*Carlson v. Gen. Motors Corp.*, 883 F.2d 287, 293 n.6 (4th Cir. 1989)

Substantive unconscionability involves those one-sided terms of a contract from which a party seeks relief (for instance, "I have the right to cut off one of your child's fingers for each day you are in default"), while procedural unconscionability deals with the process of making a contract -- "bargaining naughtiness" (for instance, "Just sign here; the small print on the back is only our standard form"). Each of these branches of unconscionability has common-law cousins; procedural unconscionability looks much like fraud or duress in contract formation, and substantive unconscionability reminds us of contracts or clauses contrary to public policy or illegal.

*Id.* at 296 n.12.   In the present case the record supports a finding of both substantive and procedural unconscionability.

[P]ersons under duress, are not bound by their contracts. But their disability must be shown by pleading, and it need not appear in any contract that the parties to it are not liable to these disabilities

*United States v. Maurice*, 26 F. Cas. 1211, 1218, 1823 U.S. App. LEXIS 350, *27, 2 Brock. 96 (C.C.D. Va. May 1, 1823)

"'Consent' that is the product of official intimidation or harassment is not consent at all." *Florida v. Bostick,* 501 U.S. 429, 438, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991). Based on King's complaint, his consent to surgery was not "voluntarily

23

> given, and [instead] the result of duress or coercion, express or implied." *Schneckloth v. Bustamonte,* 412 U.S. 218, 248, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973).

*King v. Rubenstein*, 825 F.3d 206, 217 (4th Cir. 2016). Over the years, in order to

prevail on a claim of "mutuality" or "consent" our courts typically

> …require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent.

*Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49, 93 S. Ct. 2041, 2059 (1973).

Appellee states that:

> [D]uress does not occur: "if the victim has a reasonable alternative to succumbing and fails to take advantage of it." *Blejski v. Blejski,* 325 S.C. 491, 498, 480 S.E.2d 462, 466 (Ct. App. 1997). The Court held that the test looks at the characteristics of the person being influenced. *Id.; see also Reynolds v. Reynolds* 114 N.C. App. 393, 398-399, 442 S.E.2d 133, 136 (1994). An act is wrongful if made with corrupt intent to coerce a transaction grossly unfair to the victim and not related to the subject of the proceedings. *Reynolds* at 339, 442 S.E.2d at 136.

(Doc 18) p. 37. Whether John Curtis had "a reasonable alternative to succumbing

and fail[ed] to take advantage of it" is a question of fact. If so, then he should be

bound by the "Mutual Termination Agreement"; If, on the other hand the jury were

to find that the ultimatum was not reasonable, the consideration was not

meaningful, and the choice was not fair, then the termination was "wrongful…made with corrupt intent to coerce a transaction grossly unfair to the victim and not related to the subject of the proceeding (reporting admin hours as permitted), and the "Mutual Termination Agreement" cannot foreclose his claims for breach of contract, fiduciary duty, and fraud.  Summary judgment is improper.

Finally, Appellee's claim that the Operating Partner and Employment Agreement by its express terms precludes partnership rights, such as to an accounting.  Ironically, the reliance is on two paragraphs of the Agreement, only one of which Appellee will deign to cite.  Appellee relies on the specific language of Section 4(f) of the Operating Partner and Employment Agreement, which states merely "that the Incentive Amount in Subsection 4(b) above does not constitute an ownership interest of any kind in the Corporation or any specific assets of the Corporation." (JA 58)  Appellee fails to reproduce Subsection 4(b) (JA 56), yet there is no other provision of the Agreement that is purported to disavow any such "ownership interest".  Sections 4(c) and 4(d) certainly give a successful Operating "Partner" a share of the profits, in addition to a fixed salary.[4]  Sadly, Subsection

---

[4]     The deposition testimony of Don Camacho is contradicted by his subsequent Declaration as to whether the incentive payments promised in the Agreement constituted "wages" – nonetheless, Plaintiff claims that such profit sharing is subject to his independent claim for breach of contract, as well as an indication of the fiduciary duties and contractual rights of an "Operating Partner.  Compare (JA 314-315) with (JA 222-29).

4(b) is bereft of any language regarding any "Incentive Amount", rendering the disclaimer of Subsection 4(f) ambiguous, if not meaningless. Had the drafter only correctly cited Subsection 4(c) entitled, "Incentive Amounts", instead of Subsection 4(b) "Expenses", the argument would at least be colorable, although when properly construed against the drafter, the opposite result pertains. Even without an ownership interest, however, a contracting party should be entitled to an accounting under the contract to calculate and validate the incentive payments that were promised but denied by an anticipatory breach of contract.

## CONCLUSION

For all of the reasons stated above and in the Opening Brief of Plaintiff Appellant John Curtis (Doc 14), which is expressly incorporated herein by reference, and based upon the binding and persuasive authorities cited, summary judgment is improper on Appellant's claims for Breach of Contract, Breach of Fiduciary Duty/Constructive Fraud, Breach of Contract accompanied by Fraudulent Act (and the dependent claim for Punitive Damages) and the decision of the district court in granting summary judgment on all of claims was error, and should respectfully be REVERSED, and this matter REMANDED for a trial on the merits.

/s/ William E. Moore, Jr.
N.C. Bar No. 9962
Gray, Layton, Kersh, Solomon, Furr, & Smith, P.A.
516 South New Hope Road, Post Office Box 2636
Gastonia, NC 28053
Phone:     (704) 865-4400
Fax: (704) 866-8010
E-mail: bmoore@gastonlegal.com
***Attorney for Plaintiff, John Curtis***

## **Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

[ x ] this brief contains 6,504 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), excepting portions of text appearing as images because they are direct copies from the appendix, *or*

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ ] this brief has been prepared in a proportionally spaced typeface using [*state name and version of word processing program*] in [*state font size and name of type style*], *or*

[ x ] this brief has been prepared in a proportional, serif typeface using *Microsoft Word 2010* with Times New Roman 14 point.


_____/s/ William E. Moore, Jr._____

William E. Moore, Jr., Attorney for Plaintiff/Appellant

Dated: _____09/11/2017_____

28

# CERTIFICATE OF SERVICE

I certify that on September 11, 2017, the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy of the addresses listed below:

J. Michael Honeycutt
FISHER & PHILLIPS LLP
227 West Trade Street, Suite 2020
Charlotte, NC  28202
mhoneycutt@fisherphillips.com

/s/ William E. Moore, Jr.
N.C. Bar No. 9962
Gray, Layton, Kersh, Solomon, Furr, & Smith, P.A.
516 South New Hope Road
Post Office Box 2636
Gastonia, NC 28053
Phone: (704) 865-4400
Fax: (704) 866-8010
E-mail: bmoore@gastonlegal.com
***Attorney for Appellant-Plaintiff, John Curtis***